UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **AISHA BROOKS** | : | Case No. 08-CV-2608 |
| Plaintiff, | : | |
| | : | JUDGE KATHLEEN O'MALLEY |
| v. | : | |
| **MICHAEL J. ASTRUE,** | : | **OPINION & ORDER** |
| **Commissioner of Social Security** | | |
| Defendant. | : | |

The Commissioner of Social Security ("Commissioner") denied social security benefits to the Claimant, Aisha Brooks ("Brooks"), in the above-captioned case. Brooks sought judicial review of the Commissioner's decision, and this Court referred the case to Magistrate Judge George J. Limbert ("Judge Limbert") for preparation of a Report and Recommendation ("R&R") pursuant to Local Rule 72.2(b)(1) and 28 U.S.C. §636(b)(1)(B). Both parties filed briefs in support of their respective positions. (Docs. 13, 15.) On November 25, 2009, Judge Limbert submitted his R&R recommending that the decision of the Commissioner be affirmed. (Doc. 16.) Brooks filed a timely objection to the R&R (Doc. 17), and the Commissioner filed a response (Doc. 18). For the following reasons, having conducted a *de novo* review of those portions of the R&R to which an objection was filed, the Court **OVERRULES** Brooks' objections (Doc. 17) and **ADOPTS** the R&R (Doc. 16). Accordingly, this action is **DISMISSED**.

**I.      BACKGROUND**

The R&R accurately sets forth the factual and procedural background of this case. (Doc. 16 at 1-4.) In the interest of efficiency, therefore, the Court adopts the R&R's articulation of that

background. To the extent necessary, if any, the Court will elaborate on factual and procedural issues worthy of additional consideration.

### A.     PROCEDURAL HISTORY

Judge Limbert thoroughly summarized the procedural history as follows:

> On July 21, 2004, Plaintiff [Brooks] protectively filed applications for DIB [Disability Insurance Benefits] and SSI [Supplemental Social Security], alleging disability beginning January 1, 2003, [(Doc. 13 at 1; Doc. 15 at 1)], both referring to Tr. at 13. Plaintiff apparently alleged disability due to a learning disability, internal bleeding, stomach pain, migraines, a January 2005 surgery, and sickle cell anemia. Tr. at 41-42, 47. The SSA denied Plaintiff's claim initially and upon reconsideration. *Id*. at 41-49. On May 26, 2005, Plaintiff filed a request for a hearing before an ALJ and on July 2, 2007, Plaintiff appeared with counsel at the hearing. *Id*. at 50, 308. The ALJ heard testimony from Plaintiff and Dr. Larry Kravitz, a medical expert. *Id*.

(Doc. 16 at 1-2.) Brooks asserted that, she suffers from mild mental retardation and is, therefore, disabled pursuant to Listing 12.05C:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied. . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. . .

20 C.F.R. 404, Subpt. P, Appx. 1 §12.05C. The ALJ denied Brooks' claim in a written decision on July 24, 2007, finding that Brooks had failed to satisfy two of the three §12.05C requirements. (Tr. at 13.) Those three requirements are as follows: (1) the diagnostic description of the disability, (2) a valid IQ score of 60 through 70, and (3) an additional work-related limitation.

-2-

Brooks' primary evidence, and the key issue in this case, was her 2004 IQ scores, as found by psychologist Dr. J. Joseph Konieczny. She scored a verbal IQ of 73, a performance IQ of 70, and a full-scale IQ of 69. (Doc. 16 at 3.) Despite the fact that Brooks' 69 IQ score would place her in a mild mental retardation range, Dr. Konieczny diagnosed her impairment as "borderline intellectual functioning" based on Brooks' other test results and her overall life skills and behavior. *Id.*

Along with these 2004 IQ scores, Brooks emphasized that her assignment to D.H. ("developmentally handicapped") classes during school further demonstrates that she satisfies §12.05C's first criteria – a diagnostic description of mental retardation, developing before age 22. (Tr. at 17.) The ALJ rejected this argument, however, because Brooks offered no evidence showing that she was placed in D.H. classes because of mental retardation; children are placed in D.H. classes for many other reasons, including learning disabilities, blindness, deafness, or orthopedic problems. *Id.* The ALJ nevertheless concluded that, based on her 2004 IQ score, Brooks had met the first criteria. The ALJ reasoned that,

> it can be argued that absent evidence of sudden trauma that can cause retardation, IQ scores create a rebuttable presumption of a fairly constant IQ throughout a person's life. Therefore, giving the claimant every benefit, I will find that the claimant's current IQ was comparable to her IQ before she turned 22 years old.

*Id.*

The ALJ's determination as to criteria one is rather peculiar, however, because she then found Brooks' 2004 IQ score to be invalid and, consequently, that the second criteria – a valid IQ score between 60-70 – was lacking. (Tr. at 17-19.) The ALJ based that decision on the fact that Dr. Konieczny diagnosed Brooks with borderline intellectual functioning, rather than mild mental retardation, and on Brooks' past work experience and life skills – all indicating that her IQ score was likely too low to be accurate. *Id.* With respect to the third criteria, the only additional impairment

-3-

Brooks asserted was that she can only read at a third-grade level – i.e., she is illiterate. (Tr. at 19.) The ALJ rejected this argument, relying on Dr. Kravitz's testimony that illiteracy is only a symptom of Brooks' borderline intellectual functioning, not a separate impairment as required by criteria three. *Id.* Accordingly, the ALJ concluded that Brooks was not disabled pursuant to §12.05C. (Tr. at 19-20.)

## II.  STANDARD OF REVIEW

In cases that are referred to a magistrate judge for preparation of an R&R, the Federal Magistrates Act requires that a district court conduct a *de novo* review only of those portions of a R&R to which the parties have made an objection. 28 U.S.C. §636(b)(1)(C). The district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.*

A district court's review of a final administrative decision of the Commissioner made by an ALJ in a Social Security action, however, is not *de novo*. Rather, a district court is limited to examining the entire administrative record to determine if the ALJ applied the correct legal standards in reaching her decision and if there is substantial evidence in the record to support her findings. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005).

"Substantial evidence" is evidence that a reasonable mind would accept to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). The substantial evidence standard requires more than a scintilla, but less than a preponderance of the evidence. *Id.* To determine whether substantial evidence exists to support the ALJ's decision, a district court does "not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Further, a district court must not focus, or base its decision, on

a single piece of evidence. Instead, a court must consider the totality of the evidence on record. *See Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

In fact, if there is conflicting evidence, a district court generally will defer to the ALJ's findings of fact. The Sixth Circuit instructs that "[t]he substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes that there is a *zone of choice* within which the decision maker can go either way without interference by the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)) (emphasis added). Accordingly, an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Nevertheless, even if an ALJ's decision is supported by substantial evidence, that decision will not be upheld where the Commissioner "fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007).

### III. ANALYSIS

The Court adopts and incorporates Judge Limbert's analysis here. Nevertheless, it is necessary to respond to the objections that were filed in response to the R&R. Of note, the facts in this case are undisputed; Brooks raises no objections opposing Judge Limbert's description of the facts, nor any argument against the ALJ's elaboration of the facts. (Docs. 17, 13.) At their core, Brooks' objections raise questions of law – i.e., (1) whether the ALJ properly applied the applicable

regulations and (2) whether the ALJ's decision to invalidate Brooks' IQ score was supported by substantial evidence.

### A. Judge Limbert's R&R and Brooks' Objections

The R&R recommends that this Court hold that "substantial evidence supports the ALJ's decision to find that Plaintiff's impairments do not meet or equal Listing 12.05C." (Doc. 16 at 11.) Brooks raises two objections to Judge Limbert's recommendation. First, Brooks counters that, Judge Limbert unreasonably found that the ALJ's decision to invalidate her IQ score was supported by substantial evidence, arguing that (1) the R&R lists no evidence that invalidates her IQ test results, and (2) the cases upon which Judge Limbert relies are distinguishable because they involved claimants who had not proven the first criteria – diagnostic description. (Doc. 17 at 1-2.) Second, Brooks reiterates that illiteracy should qualify as an additional impairment to satisfy the third criteria. *Id.* Under the regulatory scheme, in order for this Court to find in favor of Brooks, it must conclude that the ALJ's decisions with respect to both criteria 2 and 3 were not supported by substantial evidence or were made without applying the correct legal standard.[1]

#### 1. Criteria Two

Criteria two of §12.05C requires a *valid* IQ score of 60 through 70. 20 C.F.R. 404, Subpt. P, Appx. 1 §12.05C. Central to Brooks' first objection is her argument that the ALJ cannot invalidate her IQ score without substantial evidence showing that the <u>testing itself</u> was invalid. (Doc. 17 at 1; Doc. 13 at 7.) In other words, Brooks argues that, because there is no evidence that she was uncooperative during the test or did anything to artificially lower her score, the IQ score must be

---

[1] While Judge Limbert questions the ALJ's determination with respect to the first criteria because it was based on an IQ score later deemed invalid, he still acknowledged that the ALJ did, indeed, find the first criteria satisfied. (Doc. 16 at 8.)

-6-

valid. The ALJ found, however, that the medical expert's testimony, Dr. Konieczny's borderline intellectual functioning diagnosis, and evidence of Brooks' past work experience and life activities sufficiently demonstrated the invalidity of her IQ score, despite no appearance that Brooks was uncooperative during the testing. (Tr. at 17-19.) The key legal questions, therefore, become (1) whether these other factors can properly be considered by the ALJ when determining the validity of an IQ score, and (2) if so, was there substantial evidence as to those factors to support the ALJ's invalidation of Brooks' IQ score.

### a. Whether IQ Scores can be Invalidated without Evidence of Testing Impropriety

Courts have found IQ scores to be invalid based on the test subjects' bad faith during the examination. *See, e.g., Shepherd v. Sullivan*, 889 F.2d 1088, at *4 (6th Cir. 1989) (unpublished) ("IQ test was invalid due to bad faith and malingering"); *see also Lipford v. Sec'y of HHS*, 762 F.2d 1009 (6th Cir. 1985) (unpublished). A finding that the claimant was uncooperative or acted in bad faith during the test, as Brooks asserts, is not required, however, to properly invalidate an IQ score. Other factors outside of the test itself, including life skills, daily activities, and past work experience, have all been considered as well. *See McDonald v. Sec'y of HHS*, 786 F.2d 1165, at *13 (6th Cir. 1986) (unpublished) ("Care should be taken to ascertain that test results are consistent with daily activities and behavior" (quoting §12.00B4)[2]); *accord Muncy v. Apfel*, 247 F.3d 728, 733 (8th Cir. 2001) ("An ALJ may disregard a claimant's IQ score when it is derived from a one-time examination

---

[2]This exact phrasing no longer exists in the regulations, but other current sections reiterate the same concept. For example, with respect to psychological testing, when "considering the validity of a test result, we should note and resolve any discrepancies between formal test results and the individual's <u>customary behavior and daily activities</u>." 20 C.F.R. Pt. 404, Appx. 1 §5C (emphasis added).

by a non-treating psychologist, particularly if the score is inconsistent with the claimant's daily activities and behavior.").

Indeed, "[t]he regulations do not limit the question of validity to test results alone in isolation from other factors." *Brown v. Sec'y of HHS*, 948 F.2d 268, 269 (6th Cir. 1991) ("The I.Q. score must reflect the plaintiff's true abilities as demonstrated by his or her performance at work, household management and social functioning. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 B-C. . . In assessing the validity of a claimant's I.Q., 'information from both medical and nonmedical sources may be used to obtain detailed descriptions of the individual's activities of daily living; social functioning; concentration, persistence and pace; or ability to tolerate increased mental demands (stress).' 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 D.").

Brooks also argues that her borderline intellectual functioning diagnosis should not have been considered when the ALJ invalidated her IQ score. (Doc. 17 at 1-2.) Along these lines, she further asserts that the cases upon which Judge Limbert relies[3] are distinguishable because the claimants in those cases, unlike her, failed to satisfy the first criteria – diagnostic description. Judge Limbert cites both cases in support of the proposition that ALJs can look to a claimant's diagnosis as one factor when determining IQ score validity. (Doc. 16 at 8-9.) Brooks counters that neither case supports such a position because neither one was resolved on IQ invalidity grounds – i.e., the Sixth Circuit considered the claimant's diagnosis, but only for purposes of determining the diagnostic description aspect of §12.05C. (Doc. 17 at 1-2.)

As an initial matter, Brooks' reliance on the ALJ's criteria one determination is misplaced. That decision by the ALJ, as noted above, was a somewhat perplexing one; she found the diagnostic

---

[3]*Cooper v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 450, 452 (6th Cir. 2007) and *West v. Comm'r Soc. Sec. Admin.*, 240 Fed. Appx. 692, 698-699 (6th Cir. 2007).

description satisfied by relying solely on Brooks' 2004 IQ scores, which she later held invalid. (Tr. at 17.) Part of her reasoning for that invalidation, in fact, was that Brooks was diagnosed with borderline intellectual functioning, <u>not</u> mild mental retardation. *Id.* Therefore, Judge Limbert was correct to question the ALJ's decision giving Brooks the benefit of the doubt on the first criteria.[4] (Doc. 16 at 8.)

Setting aside the fact that the ALJ lacked substantial evidence to find criteria one and could have denied Brooks' claim on that ground, Brooks is correct that the cases cited by Judge Limbert – *Cooper* and *West* – never directly addressed the IQ invalidity issue. Both cases still reiterate the significance the Sixth Circuit places on a claimant's diagnosis, however, at least in the context of criteria one. While the Sixth Circuit has never expressly required an actual diagnosis of mental retardation, an IQ test score within the requisite range alone is not enough; the record must also indicate that the claimant satisfies the diagnostic description criteria. *See Daniels*, 70 Fed. Appx. at 873 (While the ALJ recognized the claimant's IQ score of 67, "he determined that she nevertheless was not mentally retarded, pointing out Dr. Berg's observation that she clinically appeared to function at a level exceeding her test score."); *accord Foster v. Halter*, 279 F.3d 348, 354 (6th Cir.

---

[4]It appears that the ALJ was either (1) imprecise – that she was actually just assuming *arguendo* that, even if criteria one was met, criteria 2 and 3 were not, or (2) lacked substantial evidence to support finding criteria one. In fact, the ALJ did not even purport to base her finding of criteria one on substantial evidence; she merely gave Brooks the benefit of the doubt as to that requirement. (Tr. at 17.) Brooks, indeed, offered no substantial evidence supporting such a finding. Accordingly, the ALJ should have denied benefits based on a lack of criteria one. *See Daniels v. Comm'r of Soc. Sec.*, 70 Fed. Appx. 868, 872 n.1 (6th Cir. 2003) ("Plaintiff argues on appeal that Listing 12.05(C) only requires a claimant to provide an I.Q. score of 60-70 and possess an additional limitation, i.e., the diagnostic description in the introductory paragraph of Listing 12.05(C) does not impose additional required showings. However, we already have rejected this argument. *See Foster*, 279 F.3d at 354-55 (requiring a claimant additionally to demonstrate 'significantly subaverage general intellectual functioning with deficits in adaptive functioning' and an onset preceding age 22).").

2001) ("A claimant must demonstrate that her impairment satisfies the diagnostic description for the listed impairment in order to be found disabled thereunder. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(A) ('Specific symptoms, signs, and laboratory findings in the paragraph A criteria of any of the listings in this section cannot be considered in isolation from the description of the mental disorder contained at the beginning of each listing category.')").

It is true that a patient's borderline intellectual functioning diagnosis does not necessarily indicate that the doctor found his or her IQ score – falling in a lower range – to be invalid. A doctor could very well diagnose a patient with borderline intellectual functioning based on other factors, including other tests and the patient's behavior and lifestyle, but still view the patient's IQ score in the mental retardation range to be valid. *Cf. Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 126 (6th Cir. 2003) (Two doctors concluded that the claimant "was actually operating within the borderline range of intellectual functioning, although her intelligence test scores, standing alone, would indicate mental retardation."). That is what appears to have happened in this case. (Doc. 16 at 9.)

With respect to assessing IQ score validity, while a claimant's diagnosis is not alone dispositive, it cannot be ignored entirely. A divergent diagnosis is certainly relevant evidence that can be considered when an ALJ assesses <u>both</u> (1) whether the diagnostic description is met <u>and</u> (2) whether an IQ score is valid. *See Cooper*, 217 Fed. Appx. at 452 ("it is not enough for a claimant to point to one IQ score below 71; the claimant must also satisfy the 'diagnostic description' of mental retardation in Listing 12.05. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001). It is undisputed that no psychologist has diagnosed Cooper with mental retardation."); *cf. West*, 240 Fed. Appx. at 698-699 (Despite a recent full-scale IQ score of 66, the Court upheld the ALJ's denial based on the claimant's failure to demonstrate deficiencies in adaptive functioning; "Dr. Dunn's

evaluation revealed only borderline intellectual functioning and adjustment disorder, not mental retardation.").

Accordingly, factors external to the test itself, including Brooks' lifestyle, daily behavior, past work experience, medical evidence, and her borderline intellectual functioning diagnosis, could properly be considered by the ALJ when she found Brooks' IQ score invalid.

### b. Whether Substantial Evidence Supports Invalidating Brooks' IQ Score

Having found that the ALJ *could* consider the factors that she did, the Court next turns to whether there was substantial evidence to support the ALJ's decision to invalidate Brooks' IQ score. The following evidence was presented that supports the ALJ's decision: Dr. Konieczny, who performed Brooks' IQ test, diagnosed her with borderline intellectual functioning, not mild mental retardation. (Tr. at 141.) He reasoned that, regardless of the fact that her IQ score fell within the mild mental retardation range, her memory and adaptive functioning test results were beyond what would be typical for a person diagnosed with mild mental retardation. *Id.* Dr. Kravitz agreed with Dr. Konieczny's assessment, moreover, and highlighted numerous aspects of Brooks' life activities which were inconsistent with a mild mental retardation IQ score of 69. (Tr. at 326-27.) He also testified that the margin of error for such IQ tests is roughly 5 points and that Brooks' score was, thus, within the margin of error.[5] (Tr. at 332.)

---

[5]This margin of error issue must be discounted, however, and this Court does not consider it when assessing whether the ALJ's decision was supported by substantial evidence. *See Harris v. Comm'r of Soc. Sec.*, No. 08-472, 2010 WL 749654, at *10 (S.D. Ohio 2010) ("Listing 12.05C does not contain any language permitting or requiring ALJs to raise-or claimants to lower-IQ test scores by any margin of error.") (citing *Dover v. Apfel*, 2000 WL 135170, at *2 (10th Cir. 2000); *see Anderson v. Sullivan*, 925 F.2d 220, 223 (7th Cir. 1991)).

Furthermore, Brooks "lives independently with her children, cares for and helps her children, cooks, does her own laundry, has a driver's license and drives, shops, and handles her own money." (Tr. at 19, 326.) With respect to Brooks' work experience, Dr. Kravitz testified that,

> her training and certification as a State Tested Nurse's Assistant (STNA), her successful performance of home health care job duties, which included shopping for her patients, and her successful performance of a cash register and calculator as a cashier, also suggested greater capacity than would be expected by someone with mild mental retardation.

*Id.*

The only evidence Brooks offered to support the validity of her IQ score, apart from her own testimony, was as follows: (1) the fact that she was assigned to D.H. ("developmentally handicapped") classes when in school,[6] and (2) the fact that Dr. Konieczny did not suspect any bad faith on her part during the IQ testing itself. (Doc. 13 at 7-8.)

Based on the above evidence, the ALJ determined that Brooks' IQ score – the only significant evidence supporting her assertion of §12.05C disability – was invalid. Apart from Brooks' contention that the ALJ should not have considered her life skills and actual diagnosis, her primary argument is that Dr. Kravitz and the ALJ failed to properly rely upon the *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition ("DSM-IV"). (Doc. 13 at 7-8.) Brooks argues that her behavior and daily activities are not inconsistent with the DSM-IV's description of someone with mild mental retardation.[7] Indeed, the DSM-IV is "one of the leading texts in medicine" and is

---

[6]Although, she offered no evidence explaining the reason for that assignment. (Tr. at 17.)

[7]Brooks quotes the DSM-IV as follows: "Mild mental retardation is roughly equivalent to what used to be referred to as the educational category of 'educable.' This group constitutes the largest segment (about 85%) of those with the disorder. As a group, people with this level of Mental Retardation typically develop social and communication skills during the pre-school years (ages 0-5 years), have minimal impairment in sensory motor areas and often are not distinguishable from children without mental retardation until a later age. By their late teens,

-12-

consulted by courts in the Sixth Circuit when evaluating disability claims. *Burrell v. Comm'r of Soc. Sec.*, No. 99-4070, 2000 U.S. App. LEXIS 33161, at *4 (6th Cir. Dec. 8, 2000) (citing *Brown*, 948 F.2d at 270); *Chandler v. Astrue*, No. 08-2265, 2010 U.S. Dist. LEXIS 1503, at *17 (N.D. Ohio Jan. 8, 2010) ("whether or not Plaintiff meets the requirements of the DSM-IV is relevant to whether or not she meets Listing 12.05.").

In this case, the ALJ did, in fact, consider the DSM-IV when rendering her decision. During the hearing, the ALJ, Brooks' attorney, and Dr. Kravitz had a lengthy discussion about the DSM-IV requirements. (Tr. at 333-39.) As articulated by the ALJ, the DSM-IV states that, mild mental retardation reflects deficiencies in at least two functional skill areas.[8] (Tr. at 18.) The ALJ went through these functional skill areas, considering both doctors' assessments and Brooks' own testimony; she concluded that Brooks was not deficient in any of them. (Tr. at 18-19.)

While this Court's *de novo* review of the evidence based on the DSM-IV criteria may have produced a different result, the standard here only requires that there be substantial evidence supporting the ALJ's decision, *Longworth*, 402 F.3d at 595. Brooks' activities are not entirely inconsistent with the DSM-IV description quoted in footnote 7, but that alone is not enough to overcome all of the factors undermining her IQ score's validity. Here, the ALJ considered the DSM-

---

they can acquire academic skills up to approximately the sixth grade level. During their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress. With appropriate supports, individuals with mild mental retardation can usually live successfully in the community, either independently or in supervised settings." (Doc. 13 at 7-8 (citing DSM-IV at 43)).

[8]Those skill areas are communication, health, leisure time, safety, school, self-care, social, taking care of a home, and work. (Tr. at 18.)

IV criteria, as she was required to do, including the section highlighted by Brooks.[9] Based on the evidence presented, she concluded that Brooks' IQ score was invalid. (Tr. at 18-19.) That decision to invalidate Brooks' IQ score was supported by substantial evidence, as explained below.

First, Dr. Konieczny diagnosed Brooks with borderline intellectual functioning, despite the fact that her IQ score fell just within the mild mental retardation range. (Tr. at 141.) He based this diagnosis on his full medical evaluation of Brooks, including memory and adaptive functioning tests, which produced results inconsistent with an IQ score within the mental retardation range. *Id.* Like the claimants in *West*, *Cooper*, and *Daniels*, Brooks was never diagnosed with mental retardation. *West*, 240 Fed. Appx. at 698-99; *Cooper*, 217 Fed. Appx. at 452; *Daniels*, 70 Fed. Appx. at 872. She was only diagnosed with borderline intellectual functioning. (Tr. at 141.) As explained above, that diagnosis – which would generally suggest a higher IQ – is relevant evidence that her IQ score was potentially invalid.

Second, Dr. Kravitz emphasized how important Brooks' life skills and experience were in distinguishing an IQ score within a mild mental retardation range. Her work experience, behavior, and skills are similar to those of the claimants in *Cooper*, *Daniels*, and *McDonald* – claimants who were all denied benefits, at least in part, because of those factors. In *Cooper*, the claimant "performed a number of common activities inconsistent with mental retardation, including semiskilled work for a number of years, playing guitar, and riding a motorcycle." 217 Fed. Appx. at 452. Daniels' "educational background and work experience demonstrate[d] an 'ability to perform relatively complicated tasks.'" 70 Fed. Appx. at 873 (citing *Foster*, 279 F.3d at 355). McDonald worked for 24 years as a patient technician and the "Sixth Circuit refused to accept [her] IQ score

---

[9]Brooks' attorney read the DSM-IV excerpt on the record during the hearing and the ALJ read it, as well. (Tr. at 333-34, 338.)

of 66 produced when [she] was over age 22 because of evidence of past vocational and academic achievement." *Bilka v. Comm'r of Soc. Sec.*, 252 F. Supp. 2d 472, 476 (N.D. Ohio 2002) (citing *McDonald*, 786 F.2d 1165, at *14-15).

Among other activities, Brooks cares for her children, lives independently, cooks for herself, does her own laundry, drives, and has held many jobs. (Tr. at 326.) Most significantly, she successfully received a State Tested Nurse's Assistant (STNA) certification and then worked as a nurse's assistant. (Tr. at 335-36.) Based on these life experience factors, both experts' conclusions, and the borderline intellectual functioning diagnosis, the ALJ determined that Brooks did not fit the DSM-IV definitions of mild mental retardation and that her IQ score must be invalid. (Tr. at 18-19.) The Court finds that all of these factors amount to substantial evidence sufficient to affirm the ALJ's decision.

One case does favor Brooks' position to some extent and is worthy of additional discussion. In *Brown*, as explained above, the Sixth Circuit acknowledged that outside factors, including lifestyle and behavior, should be considered when determining the validity of IQ scores. 948 F.2d at 269. The Sixth Circuit stated, however, that "Brown's I.Q. scores indicate Mild Mental Retardation. Furthermore, Mr. Brown's biography fits squarely within the DSM-III-R profile of a mildly retarded individual." *Id.* at 270. The Sixth Circuit held, accordingly, that given the specific circumstances of Brown's case, there was insufficient evidence to invalidate his IQ scores. *Id.*

*Brown* is distinguishable from this case, however. The evidence undermining the IQ scores in *Brown* was similar to that offered here,[10] but there are significant differences as well. The most

---

[10]In *Brown*, the Secretary emphasized the following facts: Brown "is able to use public transit; he has a driver's license; he visits friends; he is able to make change at a grocery store; he can do his own laundry and clean his room; he completed the sixth grade; he has a limited level of reading comprehension . . .; and as a truck driver, Mr. Brown recorded mileage, the hours he

striking distinctions are (1) that Brooks' work experience – as a cashier and later as a state certified nurse's assistant – involved more complicated tasks than did Brown's job as a truck driver, and (2) that Brooks' diagnosis suggested that her IQ results were potentially inaccurate, whereas Brown had no such diagnosis to undermine his IQ score.

The court in *Brown* also noted "that the Secretary could have administered a second I.Q. test were he certain of the invalidity of Mr. Brown's scores. He did not." This statement might appear to imply that ALJs must order additional testing in every case before denying benefits on IQ invalidity grounds.[11] In none of the previously cited cases, however, did courts overturn ALJ decisions to invalidate or discount IQ scores because the ALJ failed to have a second IQ test administered. *See, e.g., McDonald*, 786 F.2d 1165; *Daniels*, 70 Fed. Appx. 868; *West*, 240 Fed. Appx. 692.

Furthermore, an "ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster*, 279 F.3d at 355 (citing 20 C.F.R. §§ 404.1517; 416.917). While the *Foster* Court did not directly address invalidation of an IQ score, the Sixth Circuit was confronted with Foster's assertion that additional testing was necessary because the ALJ misinterpreted her IQ reports. *Id.* at 356. The Sixth Circuit affirmed the district court's order upholding the ALJ's denial of benefits. *Id.* Thus, at least by implication, the Sixth Circuit

---

worked, and the places he drove." 948 F.2d at 270.

[11]During the hearing, the ALJ did propose sending Brooks out for another mental status evaluation. (Tr. at 338.) Dr. Kravitz reasoned against administering one, however, stating that no IQ test would effectively determine Brooks' mental status given all of the external factors, such as her ability to live independently and gain the ability to work – i.e., these factors would distinguish any IQ result within the mild mental retardation range. (Tr. at 339.) Apparently based on Dr. Kravitz' recommendation and the fact that §12.05C's third criteria was so clearly absent, the ALJ decided not to order an additional test. (Tr. at 339-40.)

recognized that additional testing is not always required; it generally is at the ALJ's discretion. The ultimate question is not whether an additional test was administered, but whether the ALJ had substantial evidence to support her conclusion that the IQ score was invalid – a conclusion which, of course, could be based on additional IQ tests, but need not be in all cases.

While the best practice may have been to order a second IQ test, the Court must defer to the ALJ unless she applied an incorrect legal standard or lacked substantial evidence to support her decision, *Longworth*, 402 F.3d at 595. As explained above, there is no absolute duty to order additional IQ testing, and based on the evidence presented, the Court has already concluded that the ALJ's decision to invalidate Brooks' IQ score was supported by substantial evidence, even without an additional IQ test.

For the foregoing reasons, the ALJ's decision to invalidate Brooks' IQ score, finding a lack of criteria two, applied the correct legal standards and was supported by substantial evidence. Accordingly, the Court cannot disturb it.

### 2. Criteria 3: Whether Illiteracy is an Additional Impairment

Even if the Court had found in favor of Brooks on every other issue discussed above, the ALJ's decision must still be upheld because Brooks' illiteracy in this case cannot qualify as an additional impairment under §12.05C. On this issue, Brooks argues that,

> an individual suffering from mild mental retardation can acquire academic skills up to approximately the sixth grade level. An individual capable of reading at the sixth grade level is not illiterate. Thus, illiteracy is an additional severe impairment for an individual suffering from mild mental retardation.

(Doc. 13 at 8.) This argument mischaracterizes the §12.05C additional impairment requirement, however. §12.05C clearly requires that the claimant, who has mental retardation, also have a separate impairment preventing her from performing jobs that her mental disability alone would not

-17-

preclude. The classic example is a person with mental retardation who suffers a severe physical injury preventing him or her from performing unskilled, manual labor. *See Mowery v. Heckler*, 771 F.2d 966, 971 (6th Cir. 1985) ("The troublesome question is whether appellant, because of numerous physical problems . . . is now precluded from performing the kind of unskilled, heavy manual work which he performed successfully in the past despite his retardation and hearing problem."); *cf. Hamilton v. Sec'y of Health & Human Servs.*, 842 F.2d 331, at *3 (6th Cir. 1988) ("under Section 12.05(C), a claimant must prove not only that he suffers from a particular I.Q. level, but also an impairment imposing additional and significant work-related limitations.").

In this case, illiteracy is the only additional impairment asserted by Brooks. As Dr. Kravitz explained, however, illiteracy is merely a symptom of Brooks' borderline intellectual functioning, not a separate impairment. (Tr. at 340-41.) He stated that finding illiteracy to be a separate impairment would be tantamount to "double-counting." *Id.* While it appears that the Sixth Circuit has never addressed this issue explicitly, analogous Sixth Circuit case law, including *Mowery* and *Hamilton*, certainly reiterates that the additional impairment must be separate from the claimant's mental retardation.

Other circuits that have directly addressed this issue, moreover, have held that illiteracy, under similar circumstances, cannot qualify as an additional and significant work-related limitation because it is merely a symptom of the claimant's mental retardation. *See Hartzog v. Barnhart*, 189 Fed. Appx. 98, 100 (3d Cir. 2006) (Claimant "failed to establish that his illiteracy is 'another impairment, in addition to [his] mental retardation, that imposes an additional and significant work-related limitation of function.'" (citing *Williams v. Sullivan*, 970 F.2d 1178, 1184 (3d Cir. 1992)). "Hartzog's illiteracy appears to be a symptom or manifestation of his mental retardation, not an

additional impairment." (internal citation omitted)); *Buckner v. Apfel*, 213 F.3d 1006, 1012 (8th Cir. 2000) (Claimant contended that she had "a learning disability, lack[ed] good judgment, ha[d] difficulty concentrating and reasoning, [could not] speak clearly, and [was] unable to get along with other people. . . [M]ost of these asserted impairments are merely symptoms or manifestations of Buckner's mental retardation and thus cannot satisfy her obligation to show an additional impairment that meets the second part of section 12.05(C)."); *Franklin v. Chater*, No. 96-5086, 1996 U.S. App. LEXIS 33326, at *8-9 (10th Cir. Dec. 20, 1996) (unpublished) ("Like the evidence of claimant's illiteracy, this evidence demonstrates symptoms of claimant's mental retardation, and does not satisfy claimant's obligation to show an additional impairment meeting the second prong of listing § 12.05(C)."); *cf. Wolfe v. Chater*, 86 F.3d 1072, 1078 (11th Cir. 1996) ("There is nothing in the regulations or case law to indicate that illiteracy, in and of itself, should be considered a nonexertional impairment.").

Because Brooks' illiteracy is merely a symptom of her borderline intellectual functioning, as explained by Dr. Kravitz (Tr. at 340-41), it cannot qualify as an <u>additional</u> and significant work-related functional limitation. Accordingly, the ALJ's assessment on this issue applied the correct legal standard and was supported by substantial evidence.

### IV. <u>CONCLUSION</u>

The Court is, of course, sympathetic to Brooks' situation. The Court is bound to uphold the ALJ's decision in this case, however, because correct legal standards were applied and the decision was supported by substantial evidence. For the foregoing reasons, the Court **OVERRULES** Plaintiff Brooks' objections (Doc. 17) and **ADOPTS** the R&R (Doc. 16). Accordingly, this action is **DISMISSED**.

**IT IS SO ORDERED.**

<u>s/Kathleen M. O'Malley</u>
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: March 24, 2010**